**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CV-60757-RUIZ/STRAUSS**

**REINHARD ANTONIO GARCIA,**

Plaintiff,

v.

**KILOLO KIJAKAZI,**
Acting Commissioner of Social Security,

Defendant.

_____/

**REPORT AND RECOMMENDATION**

THIS MATTER came before the Court upon Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") [DE 16-1] and Defendant's Motion for Summary Judgment ("Defendant's Motion") [DE 17]. This case has been referred to me for a ruling on all pre-trial, non-dispositive matters and for a report and recommendation on any dispositive matters. [DE 2]. I have reviewed both motions, all summary judgment materials, and the record in this case. For the reasons discussed herein, I respectfully **RECOMMEND** that Plaintiff's Motion [DE 16-1] be **DENIED** and that Defendant's Motion [DE 17] be **GRANTED**.

**BACKGROUND**

**I.    PROCEDURAL HISTORY**

Plaintiff filed a claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on March 20, 2020, alleging a disability onset date of January 24, 2018. [Tr. 63, 73, 259-60]. His claim was denied initially and upon reconsideration. [Tr. 63, 73, 83, 97, 99, 114]. Thereafter, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). [Tr. 194-96]. Plaintiff's hearing was held, telephonically, on April 1, 2021, before ALJ Richard J.

Ortiz-Valero. [Tr. 32-62]. Plaintiff appeared with counsel and a vocational expert ("VE") testified. [Tr. 34-35]. On June 30, 2021, the ALJ issued his decision, finding that Plaintiff was not "disabled" under the Social Security Act. [Tr. 12-26]. Plaintiff requested Appeals Council review and his request was denied on February 22, 2022, thereby leaving the ALJ's decision as the final decision of the Commissioner. [Tr. 1-5]. Consequently, on April 19, 2022, Plaintiff filed this action seeking judicial review of the Commissioner's decision. [DE 1].

## II.   **PLAINTIFF'S BACKGROUND AND HEARING TESTIMONY**

Plaintiff was fifty-one years old at the time of his alleged onset date, fifty-three years old at the time he applied for DIB and SSI, fifty-four years old at the time of the hearing, and fifty-five years old when the ALJ issued his decision. [Tr. 34, 37]. He completed three years of high school. [Tr. 37]. Plaintiff's past relevant work was as a driver for Lazar Interiors; he worked there for thirty-two years. [Tr. 50-51]. According to Plaintiff, in addition to his driving responsibilities at Lazar Interiors, he also served as a delivery man, put down carpeting, and learned how to upholster and refinish furniture. [Tr. 50].

In his initial application, Plaintiff stated that he had the following illnesses, injuries, and conditions: asthma, shoulder surgery, and spinal fusion. [Tr. 85, 280]. Plaintiff also had a history of diabetes mellitus and was obese. [Tr. 18, 89, 91, 94].

## III.   **VE'S HEARING TESTIMONY**

The VE identified Plaintiff's position with Lazar Interiors as a composite job made up of three different occupations: truck driver, furniture upholsterer, and drapery hanger. [Tr. 50]. Then, the ALJ posed three hypothetical questions to the VE to determine whether the individual described in the hypothetical could perform Plaintiff's past relevant work. [Tr. 51-57]. In his first hypothetical question to the VE, the ALJ asked whether an individual with the following

limitations could perform Plaintiff's past relevant work: can lift and carry fifty pounds occasionally and twenty-five pounds frequently; sit for six hours in an eight hour day; stand and/or walk for six hours in an eight-hour day; can only frequently reach overhead with the non-dominant left upper extremity; must avoid concentrated exposure to fumes, odors, dust, gases; and must avoid any exposure to concentrated heights and moving machinery.  [Tr. 51-52].  The VE opined that the hypothetical individual would not be able to perform Plaintiff's past relevant work.  [Tr. 52].  Although the VE noted that the hypothetical individual would be able to perform the furniture upholster component of the composite job, the individual would not be able to complete the other components of the composite job.  [Tr. 52, 57-58].  However, the VE opined that this individual could perform the positions of laundry worker, dining room attendant, and hand packager.  [Tr. 53].

In his second hypothetical question, the ALJ hypothesized an individual with the following limitations: can lift and carry twenty pounds occasionally and ten pounds frequently; sit for six hours in an eight hour day; stand and/or walk for six hours in an eight-hour day; can only frequently reach overhead with the non-dominant left upper extremity; must avoid concentrated exposure to fumes, odors, dust, gases; and must avoid any exposure to concentrated heights and moving machinery.  [Tr. 53]  The VE opined that the hypothetical individual would not be able to perform any components of Plaintiff's past relevant work.  [Tr. 54].  However, the VE opined that this individual could perform the positions of merchandise marker, laundry sorter, and office helper. *Id.*

In his third hypothetical question, the ALJ hypothesized an individual with the following limitations: can lift and carry ten pounds occasionally and less than ten pounds frequently; sit for six hours in an eight hour day; stand and/or walk for two hours in an eight-hour day; can only

frequently reach overhead with the non-dominant left upper extremity; must avoid concentrated exposure to fumes, odors, dust, gases; and must avoid any exposure to concentrated heights and moving machinery. [Tr. 56]. The VE opined that the individual would not be able to perform any components of Plaintiff's past relevant work. [Tr. 56-57].

Finally, because Plaintiff was almost fifty-five years old (the "advanced age" classification) the ALJ asked whether there were any skills from his past relevant work that were transferrable to light work. [Tr. 54]. The VE stated that the skill of commercial driving was transferrable. [Tr. 55]. The VE mentioned a few other skills associated with driving a commercial vehicle that could transfer to light work: applying knowledge of commercial driving regulations, preparing receipts for loads picked up and delivered, maintaining a truck log, and inspecting the truck. *Id.* According to the VE, these skills would be transferrable to the positions of rental car deliverer and chauffeur. [Tr. 56].

## STANDARD OF REVIEW

In reviewing claims brought under the Social Security Act, a court's role is limited. *See Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). The Commissioner's findings of fact must be affirmed if they are based upon "substantial evidence." *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). "Substantial evidence is . . . such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Moore*, 405 F.3d at 1211 (citing *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)). It "is something 'more than a mere scintilla, but less than a preponderance.'" *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (citation omitted); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (stating that "the threshold for such evidentiary sufficiency is not high"). "If the Commissioner's decision is supported by substantial

evidence, this Court must affirm, even if the proof preponderates against it." *Dyer*, 395 F.3d at 1210 (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004)); *see also Valdez v. Comm'r of Soc. Sec.*, 808 Fed. Appx. 1005, 1008 (11th Cir. 2020) (same).  Courts "may not decide the facts anew, reweigh the evidence, or substitute [their] judgment for that of the [Commissioner]." *Dyer*, 395 F.3d at 1210 (quoting *Phillips*, 357 F.3d at 1240 n.8); *Bloodsworth*, 703 F.2d at 1239.  In addition to determining whether the Commissioner's factual findings are supported by substantial evidence, courts must determine whether the ALJ applied the correct legal standards.  *See Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).

## DISCUSSION

### I.    THE SEQUENTIAL EVALUATION

A "disability" is defined as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In making a disability determination, "the ALJ must consider the evidence in its entirety, including: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant . . . and (4) the claimant's age, education, and work history." *Maffia v. Comm'r of Soc. Sec.*, 291 F. App'x 261, 262-63 (11th Cir. 2008) (quoting *DePaepe v. Richardson*, 464 F.2d 92, 94 (5th Cir.1972)); *see Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir. 1982).

To arrive at a determination as to disability, the ALJ must undertake the sequential evaluation embodied in 20 C.F.R. § 416.920.  This process requires that the ALJ first determine whether the claimant is presently engaged in substantial gainful activity.  *See* 20 C.F.R. § 416.920(b).  If so, a finding of "no disability" is made.  20 C.F.R. § 416.920(a)(4)(i).

If the claimant is not engaged in such work, then the ALJ must proceed to the second step and determine whether the claimant suffers from a "severe impairment." 20 C.F.R. § 416.920(a)(4)(ii). An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities. *See* 20 C.F.R. § 416.920(c). If no severe impairment is found, then the ALJ will conclude that there is no disability; if a severe impairment is found, then the ALJ will proceed to the next step of the analysis. *See id.*

The third step requires the ALJ to determine whether the claimant's impairment meets or equals those listed in Appendix 1 of the Regulations. *See* 20 C.F.R. § 416.920(d). If so, the ALJ will find the claimant disabled without considering age, education, and work experience. *See id.* If not, the inquiry will proceed to the next stage. *See* 20 C.F.R. § 416.920(e).

Step four requires the ALJ to determine whether the claimant has the residual functional capacity ("RFC") to perform past relevant work. *See* 20 C.F.R. § 416.920(a)(4)(iv). The Regulations define RFC as "the most you can still do despite your limitations." 20 C.F.R. § 416.945(a)(1). The RFC determination takes into account "all of the relevant medical and other evidence," including the claimant's own testimony and the observations of others. 20 C.F.R. § 416.945(a)(3). An ALJ makes an RFC determination by considering the claimant's physical and mental abilities and limitations. *See* 20 C.F.R. § 404.1545. When assessing a claimant's physical abilities, an ALJ evaluates the claimant's ability to sit, stand, walk, lift, carry, push, pull, stoop, crouch, and reach. *See* 20 C.F.R. § 404.1545(b). And when assessing a claimant's mental abilities, an ALJ evaluates whether a claimant has limitations in "understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting." 20 C.F.R. § 404.1545(c).

To determine the physical exertion requirements of jobs in the national economy, the Commissioner classifies jobs as sedentary, light, medium, heavy, and very heavy. *See* 20 C.F.R. § 404.1567. Jobs are also classified as unskilled, semi-skilled, and skilled. *See* 20 C.F.R. § 404.1568. Then, an ALJ must compare the RFC with the physical and mental demands of the claimant's past relevant work to determine whether the claimant is still capable of performing that kind of work. If so, the claimant is found not disabled. *See* 20 C.F.R. § 416.920(f).

If the claimant establishes an inability to return to past relevant work, the inquiry turns to step five. *See* 20 C.F.R. § 416.920(a)(4)(v). "At step five the burden of going forward shifts to the [Commissioner] 'to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.'" *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (quoting *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). If the Commissioner points to possible alternative employment, then the burden returns to the claimant to prove an inability to perform those jobs. *See id.* At this fifth and final step, the ALJ must resolve whether the claimant is capable of performing other work. *See* 20 C.F.R. §§ 416.920(g), 416.960(c).

To help evaluate whether sufficient jobs exist that can be performed given the claimant's age, education, and physical limitations, the Commissioner has promulgated Medical Vocational Guidelines. *See* 20 C.F.R. § 404, subpt. P, app. 2. The guidelines may apply "where a person is not doing substantial gainful activity and is prevented by a severe medically determinable impairment from doing vocationally relevant past work." 20 C.F.R. § 416.969. The guidelines are composed of detailed grids and rules, which direct a finding of disabled or not disabled based on a claimant's RFC, age, education, and previous work experience. *See Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987).

7

Yet, the guidelines "do not cover all possible variations of factors" and are inapplicable "if one of the findings of fact about the person's vocational factors and [RFC] is not the same as the corresponding criterion of a rule."  20 C.F.R. § 416.969.  Therefore, "[e]xclusive reliance on the grids is not appropriate *either* when [the] claimant is unable to perform a full range of work at a given residual functional level *or* when a claimant has non-exertional impairments that significantly limit basic work skills."  *Phillips*, 357 F.3d at 1242 (citation omitted); *see Walker*, 826 F.2d at 1002-03; *Hargis v. Sullivan*, 945 F.2d 1482, 1490 (10th Cir. 1991).  Nevertheless, in such situations, the guidelines may serve as a framework to determine whether sufficient jobs exist within a claimant's range of RFC.  *See Hargis*, 945 F.2d at 1490.  However, the Commissioner may carry his or her burden through the use of a VE when exclusive reliance on the guidelines is not appropriate.  *See Chaney-Everett v. Astrue*, 839 F. Supp. 2d 1291, 1299 (S.D. Fla. 2012) (citing *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *Walker*, 826 F.2d at 1003).  A VE provides the ALJ with a realistic appraisal of the work that a claimant is capable of performing.  *Id.* (citing *Walker*, 889 F.2d at 50).

## II.     ALJ'S APPLICATION OF THE SEQUENTIAL EVALUATION

After considering the evidence, the ALJ found that although Plaintiff could not perform his past relevant work, he could make a successful adjustment to other jobs that existed in significant numbers in the economy.  [Tr. 25-26].  Thus, the ALJ found that Plaintiff was not disabled from the Alleged Onset Date to the date of the ALJ's decision.  [Tr. 26].

As an initial matter, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2023.  [Tr. 17].  Then, addressing the first step in the sequential evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity from the Alleged Onset Date.  *Id.*  Next, the ALJ found that Plaintiff had the following severe

impairments: degenerative disc disease with cervical discectomy and fusion, obesity, degenerative

joint disease of the left shoulder with arthroscopic surgery, diabetes mellitus, and asthma. [Tr.

18]. However, according to the ALJ, none of these impairments individually or combined met or

medically equaled the severity of the impairments listed in 20 C.F.R. Part 404 Subpart P, Appendix

1. [Tr. 18-20].

> Then, the ALJ determined that Plaintiff had the RFC:
>
> to lift/carry 50 pounds occasionally and 25 pounds frequently, sit for 6 hours in an
> 8-hour day, and stand/walk for 6 hours in an 8-hour day. The claimant is also
> limited to frequently reaching overhead with his nondominant left upper extremity.
> The claimant must also avoid concentrated exposure to fumes, odors, dust, gases,
> and any exposure to unprotected heights and moving machinery.

[Tr. 20].

After assessing Plaintiff's RFC and discussing the medical evidence supporting it, the ALJ

considered whether Plaintiff could perform his past relevant work. [Tr. 24-25]. He ultimately

concluded that Plaintiff could not perform his past relevant work. *Id.* However, the ALJ concluded

that at least three jobs existed in significant numbers in the national economy that Plaintiff could

perform. [Tr. 25-26]. The ALJ based this conclusion on the VE's testimony that an individual

with Plaintiff's age, education, past relevant work experience and RFC could perform the jobs of

merchandise marker (95,000 jobs in nation), laundry sorter (28,000 jobs in nation), and office

helper (400,000 jobs in nation). [Tr. 26]. The ALJ also concluded that the skills of commercial

driving, maintaining a truck log, and knowledge of regulations transferred from Plaintiff's past

relevant work to two other occupations: rental car deliverer and chauffer. *Id.* Thus, the ALJ found

that Plaintiff was not disabled from his Alleged Onset Date through the date of the decision. *Id.*

III.   **ANALYSIS**

    **A.  Whether the Commissioner Erred at Step Five of the Sequential Evaluation**

    Plaintiff argues that the Commissioner failed to meet her burden at step five of the sequential evaluation.  Specifically, Plaintiff argues that the ALJ erred in failing to consider the rules for transferability of skills for individuals of advanced age.  However, I find that the Commissioner met her burden at step five and the ALJ's findings are supported by substantial evidence.

    As stated above, at step five of the sequential evaluation, the ALJ is tasked with determining whether there are jobs that exist in significant numbers in the national economy that the claimant can perform.  At this part of the evaluation, the ALJ typically considers whether the claimant has past relevant work experience and, if so, whether the claimant acquired skills from that work that can be transferred to other positions.  20 C.F.R. §§ 404.1568, 416.968.  "The Social Security Administration (SSA) defines skill as 'knowledge of a work activity which requires the exercise of significant judgment that goes beyond the carrying out of simple job duties and is acquired through performance of an occupation which is above the unskilled level (requires more than 30 days to learn).'"  *Zimmer v. Comm'r of Soc. Sec.*, 211 F. App'x 819, 820 (11th Cir. 2006) (quoting SSR 82-41, 1982 WL 31389 at *2).  Skills are transferrable "when the skilled or semi-skilled work activities [the claimant] did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work."  20 C.F.R. § 404.1568(d)(1).  Of course, "[t]his depends largely on the similarity of occupationally significant work activities among different jobs."  *Id.*

    Notably, the rules regarding transferability of skills are different for persons of advanced age — individuals aged fifty-five or older at the time of the ALJ's decision.   20 C.F.R. §

404.1568(d)(4); *see also* 20 C.F.R. § 404.1563(e) (stating that "advanced age . . . significantly affects a person's ability to adjust to other work" and that there are "special rules for persons of advanced age"). According to the Code of Federal Regulations:

> If you are of advanced age (age 55 or older), *and you have a severe impairment(s) that limits you to sedentary or light work*, [the Social Security Administration] will find that you cannot make an adjustment to other work unless you have skills that you can transfer to other skilled or semiskilled work (or you have recently completed education which provides for direct entry into skilled work) that you can do despite your impairment(s).

20 C.F.R. § 404.1568(d)(4) (emphasis added).

Here, the VE found that Plaintiff acquired the transferrable skills of commercial driving, knowledge of the commercial driving regulations, maintaining a truck log, preparing receipts, and minimal inspection of a truck from his past relevant work. Plaintiff argues that because the skills identified by the VE (mainly "commercial driving") are not skills as defined by the Programs Operations Manual System ("POMS"), the ALJ erred in failing to make a proper finding on transferability of skills. Plaintiff contends that the ALJ had to make a finding on transferability of skills because he was a person of advanced age and that the ALJ's failure to make a proper finding warrants remand.

Despite Plaintiff's arguments, I find that the ALJ did not have to make a finding on transferability of skills because Plaintiff does not "have a severe impairment(s) that limits [him] to sedentary or light work." 20 C.F.R § 404.1568(d)(4). According to Plaintiff's RFC, which he has not challenged, Plaintiff could lift or carry fifty pounds occasionally and twenty-five pounds frequently, sit for six hours in an eight-hour day, and stand or walk for six hours in an eight-hour day. Although Plaintiff had some exertional limitations (limited to frequently reaching overhead with his non-dominant left upper extremity) and environmental limitations (had to avoid concentrated exposure to fumes, odors, dust, and gasses and had to avoid any exposure to

unprotected heights and moving machinery), his RFC is consistent with the ability to perform medium work. 20 C.F.R. § 404.1567(c). Because Plaintiff retained the ability to perform medium work, the ALJ did not have to make a finding on the transferability of skills. 20 C.F.R. § 404, subpt. P, app. 2, § 203.00(b) (stating that "[e]ven the adversity of advanced age . . . may be offset by the substantial work capability represented by the functional capacity to perform medium work"). Therefore, the ALJ's finding that Plaintiff could perform three light, unskilled jobs that were available in significant numbers in the national economy (merchandise marker, laundry sorter, and office helper) was sufficient to determine that Plaintiff was not disabled.

Assuming arguendo the ALJ erred in his transferability analysis, Plaintiff fails to show that this error amounted to harmful error or an error sufficient to warrant remand. *See Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying the harmless error standard to Social Security cases); *Remelius v. Saul*, 4:18-CV-01105-AGF, 2019 WL 4141034, at *9 (E.D. Mo. Aug. 30, 2019) (opining that the ALJ's errant findings regarding the transferability of the plaintiff's driving skills were not harmless). Plaintiff contends that the ALJ did not articulate how the skills he acquired in his past relevant work transferred to the positions of rental car deliverer and chauffer. However, Plaintiff wholly fails to account for the unskilled jobs of merchandise marker (95,000 jobs in nation), laundry sorter (28,000 jobs in nation), and office helper (400,000 jobs in nation) that the ALJ also found he could perform. These jobs represent a significant number of jobs in the national economy and are sufficient to sustain the ALJ's finding of "not disabled." *See Bacon v. Comm'r of Soc. Sec.*, 861 F. App'x 315, 321 (11th Cir. 2021) (affirming the ALJ's finding that 325,000 jobs was a significant number of jobs in the national economy because the Court previously stated that 80,000 jobs was significant). Plaintiff does not argue that he could not

perform these unskilled jobs, which are clearly within the limit of his RFC.  Accordingly, Plaintiff

has failed to establish entitlement to the relief he seeks.

### B. Whether the ALJ and Appeals Council Judges in This Case Were Properly Appointed.

Plaintiff argues that Acting Commissioner Nancy Berryhill had no authority under the

Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3345 *et seq.*, or the Constitution's

Appointments Clause, U.S. CONST. art. II, § 2, cl. 2., to appoint the ALJ and the Appeals Council

members who decided his case.  Consequently, Plaintiff argues that the ALJ and Appeals Counsel

members did not have authority to adjudicate his disability application and that his case must be

remanded to a new, properly appointed, ALJ for another hearing and decision.  However, I find

that Plaintiff's arguments have no merit.

### 1. The Appointments Clause and the FVRA

A brief explanation of the Appointments Clause, the FVRA, the factual background of

Berryhill's appointment as Acting Commissioner of the SSA, and Berryhill's ratification of

previous ALJ appointments is necessary to set the stage for this issue.  The Appointments Clause

provides the exclusive process by which the President may appoint "Officers of the United

States."[1]  U.S. CONST. art. II, § 2, cl. 2.  The Appointments Clause divides officers into two classes:

"principal officers" and "inferior officers."  *Lucia v. S.E.C.*, 138 S.Ct. 2044, 2051 n.3 (2018).

Principal officers must be appointed by the President with the advice and consent of the Senate.

*See id.*  Inferior officers may also be appointed by the President with the advice and consent of the

Senate, but Congress "may authorize the President alone, a court, or a department head to appoint

---

[1] Unlike officers, employees of the Federal Government are not subject to the Appointment
Clause's dictates.  *See Lucia v. S.E.C.*, 138 S.Ct. 2044, 2051 (2018).

an inferior officer." *Id.* As relevant here, and as discussed further below, the SSA Commissioner is a principal officer, while the SSA's ALJs are inferior officers.

When a principal officer vacates their position, the President has "limited authority to appoint acting officials to temporarily perform the functions of a vacant . . . office without first obtaining Senate approval." *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 294 (2017). The FVRA allows the President to exercise this limited authority to appoint acting officials without Senate confirmation. 5 U.S.C. § 3347(a).

The FVRA — specifically, section 3345 — provides that if a principal officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office" the first assistant will, by default, "perform the functions and duties of the office temporarily in an acting capacity." 5 U.S.C. § 3345(a)(1). Notwithstanding the first assistant default rule, the President may also direct a person who meets the criteria in either section 3345(a)(2) or (a)(3) "to perform the functions and duties of the vacant office temporarily in an acting capacity." 5 U.S.C. §§ 3345(a)(2)-(3). All acting officers must serve "subject to the time limitations of section 3346." 5 U.S.C. §§ 3345(a)(1)-(3).

Section 3346 states the following regarding the time limitations of acting service:

(a) Except in the case of a vacancy caused by sickness, the person serving as an acting officer as described under section 3345 may serve in the office—

    (1) for no longer than 210 days beginning on the date the vacancy occurs; or

    (2) subject to subsection (b), once a first or second nomination for the office is submitted to the Senate, from the date of such nomination for the period that the nomination is pending in the Senate.

(b)(1) If the first nomination for the office is rejected by the Senate, withdrawn, or returned to the President by the Senate, the person may continue to serve as the acting officer for no more than 210 days after the date of such rejection, withdrawal, or return.

(2) Notwithstanding paragraph (1), if a second nomination for the office is submitted to the Senate after the rejection, withdrawal, or return of the first nomination, the person serving as the acting officer may continue to serve—

(A) until the second nomination is confirmed; or

(B) for no more than 210 days after the second nomination is rejected, withdrawn, or returned.

5 U.S.C. § 3346.  For vacancies that exist "during the 60-day period beginning on a transitional inauguration day, the 210-day period under section 3346" begins either "90 days after such transitional inauguration day" or "90 days after the date on which the vacancy occurs," whichever is later.  5 U.S.C. § 3349a(b).

If an officer or employer is not "performing the functions and duties in accordance with sections 3345, 3346, and 3347" of the FVRA, "the office shall remain vacant."  5 U.S.C. § 3348(b)(1).  Additionally, an action taken by a person who is not acting in accordance with the FVRA "shall have no force or effect."  5 U.S.C. § 3348(d)(1).

## 2. Background Regarding Berryhill's Appointment

On December 23, 2016, President Barack Obama issued a memorandum regarding the order of succession in the Social Security Administration ("SSA") in the event that the SSA's Commissioner position, which is a "principal officer" position, is vacant.  *See Memorandum Providing an Order of Succession Within the Social Security Administration*, 81 Fed. Reg. 96337, 2016 WL 7487744 (Dec. 23, 2016).  President Obama's memorandum provided that the Deputy Commissioner of Operations ("DCO") would serve as the Acting Commissioner of the SSA if the Commissioner and Deputy Commissioner positions within the agency were also vacant.  *Id.*  On January 20, 2017, the date of President Donald Trump's inauguration, Carolyn Colvin — the Acting Commissioner of the SSA at the time — resigned.  *See Brian T. D. v. Kijakazi*, 580 F. Supp. 3d 615, 620 (D. Minn. Jan 20, 2022).  During Colvin's term as Acting Commissioner, the

Deputy Commissioner position was vacant. *Id.*   Thus, by virtue of President Obama's memorandum, DCO Nancy Berryhill became the new Acting Commissioner of the SSA once Colvin resigned. *Id.*

On March 6, 2018, the Government Accountability Office ("GAO") promulgated a report opining that Berryhill's period of service as an Acting Commissioner under the FVRA expired on November 16, 2017.[2]  *See* U.S. Gov't Accountability Office, Violation of the Time Limit Imposed by the Federal Vacancies Reform Act of 1998 – Commissioner, Social Security Administration (Mar. 6, 2018), https://www.gao.gov/assets/b-329853.pdf (last visited March 1, 2023).   The GAO's report concluded that Berryhill's service as Acting Commissioner between November 16, 2017 and March 6, 2018 violated the FVRA. *Id.*  "Following the GAO Notice, Berryhill stepped down as Acting Commissioner but continued to lead the SSA as DCO." *Brooks v. Kijakazi*, 1:21CV609, 2022 WL 2834345, at *14 (M.D.N.C. July 20, 2022), *report and recommendation adopted*, 1:21-CV-609, 2022 WL 17832126 (M.D.N.C. Aug. 19, 2022).   On April 17, 2018, President Trump nominated Andrew Saul to be the Commissioner of the SSA. *Id.*  After President Trump's nomination, Berryhill resumed her service as Acting Commissioner because the SSA interpreted that her continued service was permitted by section 3346(a)(2) of the FVRA, "the so-called 'spring-back' provision." *Id.*

---

[2] Notably, November 16, 2017, is 300 days (and not 210 days) from the date Berryhill began serving as Acting Commissioner.  5 U.S.C. § 3346 (stating that "the person serving as an acting officer described under section 3345 may serve . . . for no longer than 210 days beginning on the date the vacancy occurs").  However, the GAO's report noted that the 210-day period began to run 90 days after the vacancy occurred because the SSA's vacancy existed "during the 60-day period beginning on a transitional inauguration day."  *See* 5 U.S.C. § 3349a(b).

### 3. Background Regarding Berryhill's Ratification of ALJ appointments

On June 21, 2018, the Supreme Court decided *Lucia v. S.E.C.*, 138 S.Ct. 2044 (2018).  In *Lucia*, the Supreme Court held that the ALJs of the Securities and Exchange Commission ("SEC") were not simply employees of the Federal Government, but "Officers of the United States" whose appointments were subject to the Appointments Clause.  138 S.Ct. at 2051.  Because the SEC's ALJs were appointed by lower-level employees and not "the President, a court of law, or a head of department," the Supreme Court held that the SEC's appointments violated the Appointments Clause.  *Id.* (citing U.S. CONST. art. II, § 2, cl. 2).  To remedy this constitutional violation, the Supreme Court found that the petitioner was entitled to a new hearing before a different and properly appointed ALJ.  *Id.* at 2055.

Before *Lucia*, the SSA, like the SEC, used lower-level employees to appoint ALJs.  *See Carr v. Saul*, 141 S.Ct. 1352, 1357 (2021).  Thus, on July 16, 2018, "[t]o address any Appointment Clause questions involving Social Security Claims," Berryhill ratified the previous appointments of all the SSA's ALJs and approved those appointments as her own.  Social Security Ruling 19-1p; *Titles II and XVI: Effect of the Decision in Lucia v. Securities and Exchange Commission (SEC) On Cases Pending at the Appeals Council*, 84 Fed. Reg. 9582-02, 2019 WL 1202036.  Berryhill purportedly performed this action in her role as Acting Commissioner.  *See id.*

### 4. Interpretations of the FVRA

Plaintiff's argument is set against this backdrop.  Specifically, Plaintiff argues that Berryhill's period of permissible service as Acting Commissioner of the SSA under the FVRA ended on November 16, 2017, as the GAO stated in its report.  [DE 16-1 at 13].  Accordingly, Plaintiff argues, after November 16, 2017, any further service by Berryhill as Acting Commissioner violated the FVRA and, thus, all the actions she took after that date, including the

ratification of previous ALJ and Appeals Council appointments, had no legal validity. *Id.*  Plaintiff solely relies on the reasoning in *Brian T.D.* and *Richard J. M. v. Kijakazi*, 19-CV-827 (KMM), 2022 WL 959914 (D. Minn. Mar. 30, 2022) to support his argument. *Id.*  ("Plaintiff offers the exact same arguments here as the claimants in those cases.").

In *Brian T.D.*, a court in the District of Minnesota concluded that section 3346(a)(2) of the FVRA should not be interpreted as a "spring-back" provision that allowed Berryhill to resume service as an Acting Commissioner once President Trump nominated Saul to be Commissioner, but rather as a provision that "toll[ed] the running of the 210-day period." 580 F. Supp. 3d at 627, 629.  In other words, according to *Brian T.D.*, because Berryhill's 210-day period under section 3346(a)(1) had expired, and Berryhill was no longer serving as Acting Commissioner at the time of Saul's nomination, section 3346(a)(2) did not provide a separate time period within which Berryhill could serve as Acting Commissioner. *Id.*  Accordingly, *Brian T.D.* found that Berryhill's July 16, 2018 ratification of previous appointments of the SSA's ALJs was "ineffective because under the FVRA, she was not properly acting as the Commissioner at that time." *Id.* at 635. Following the Supreme Court's logic from *Lucia*, *Brian T.D.* found that the proper remedy was to remand the claimant's disability claim for a new hearing before a "properly appointed ALJ." *Id.* at 636.  In *Richard J.M.*, another court in the District of Minnesota "interpreted the provisions of the [FVRA] in the same manner" as *Brian T.D.*  *Richard J. M.*, 19-CV-827 (KMM), 2022 WL 959914, at *1 n.3.

However, the majority of other courts to address the issue have rejected the reasoning in *Brian T.D.*  *See Brent Z.* v. *Kijakazi, Acting Comm'r of Soc. Sec.*, 22-CV-511 (JWB/JFD), 2023 WL 1110449, at *10-11 (D. Minn. Jan. 30, 2023) (collecting cases); *Miranda K. Coe, v. Kilolo Kijakazi, Acting Comm'r of Soc. Sec. Admin.*, 5:22-CV-226-KDW, 2023 WL 554119, at *12

18

(D.S.C. Jan. 27, 2023) (collecting cases); *Hernandez v. Kijakazi*, CV 22-01556(FLW), 2022 WL 17751355, at *12 (D.N.J. Dec. 19, 2022) ("The majority of all other courts that have considered this issue have declined to follow the reasoning set forth in *Brian T.D.*"); *Hernandez* v. *Comm'r of Soc. Sec.*, 21CIV10658VBJCM, 2022 WL 18402121, at *15 (S.D.N.Y. Dec. 16, 2022) (stating that "the vast majority of courts to address this issue have declined to adopt *Brian T.D.*'s reasoning"), *report and recommendation adopted*, 21 CV 10658 (VB), 2023 WL 358780 (S.D.N.Y. Jan. 23, 2023); *Seago v. Kijakazi*, 1:21-CV-136, 2022 WL 17853369, at *6 (S.D. Tex. Nov. 15, 2022) (stating that "a majority of courts" have rejected the "minority view" in *Brian T.D.*), *report and recommendation adopted*, 1:21-CV-00136, 2022 WL 17852795 (S.D. Tex. Dec. 22, 2022); *M.A.K. v. Kijakazi*, 1:21-CV-03028-JLK, 2022 WL 16855690, at *4 (D. Colo. Nov. 10, 2022) (stating that "the vast majority of courts have rejected the analysis set forth in *Brian T.D.*"); *Mia S. v. Kijakazi*, 8:21-CV-439, 2022 WL 3577023, at *14 (D. Neb. Aug. 19, 2022) (stating that courts have "overwhelmingly concluded" that section 3346(a)(2) is a spring-back provision); *Williams v. Kijakazi*, 1:21-CV-141-GCM, 2022 WL 2163008, at *3 n.3 (W.D.N.C. June 15, 2022) (collecting cases).  At least one magistrate judge in this district has also recommended rejecting the analysis in *Brian T.D.  See Silva v. Comm'r of Soc. Sec.*, 9:22-CV-80431-DMM, at 15-17 (S.D. Fla. December 12, 2022).  Although none of these decisions are binding on this Court, I find the majority position persuasive.  For the reasons stated more fully below, I similarly reject the reasoning in *Brian T.D.*

### 5. Analysis of the FVRA

"The starting point in statutory interpretation is the language of the statute itself." *Bankston v. Then*, 615 F.3d 1364, 1367 (11th Cir. 2010) (quoting *Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009)).  "If the 'language at issue has a plain and unambiguous meaning with regard to

the particular dispute in the case,' and 'the statutory scheme is coherent and consistent,' the inquiry is over." *Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)).  However, if the statutory language is ambiguous, "[l]egislative history may prove helpful." *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1089 (11th Cir. 2018).

The plain text of section 3346(a) describes two different time periods during which an acting officer "may serve in the office": (1) the period of 210 days beginning on the date the vacancy occurs and (2) the period from the date of a first or second nomination while that nomination is pending.  The use of the word "or" suggests that these periods are separate alternatives.  Although *Brian T.D.* found that "or" was ordinarily used in a disjunctive and exclusive manner, as noted by *Bauer v. Kijakazi*, "the word 'or' can be used in both an 'inclusive' sense (A or B or both) and an 'exclusive' sense (A or B but not both)." 21-CV-2008-KEM, 2022 WL 2918917, at *7 (N.D. Iowa July 25, 2022) (cleaned up).  Here, all signs indicate that the "or" in section 3346(a) is inclusive rather than exclusive.  If the "or" in section 3346(a) was mutually exclusive, as *Brian T.D.* opines it should be, a person could not serve for the initial 210 days after the vacancy was created and while a nomination was pending. *Id. Brian T.D.* avoided this reading by finding that a person could only serve as an acting officer during the pendency of a nomination if the nomination was submitted during their initial 210-day term as acting officer under section 3346(a)(1).  580 F. Supp. 3d at 631.  However, "[t]his reads language into the statute that does not exist." *Bauer*, 21-CV-2008-KEM, 2022 WL 2918917, at *7.  Additionally, "Congress did not qualify the use of 'or' with 'either,' which tends to indicate that the alternatives are mutually exclusive." *Id.*  Congress also did not use the word "unless."  As *Bauer* explains, *Brian T.D.* views subsection (a) as setting out when acting service "must end, rather than setting out when acting

service is allowed." *Id.*  But if subsection (a)(2) were only meant to be an extension of the 210-day period of (a)(1), as *Brian T.D.* opines, rather than its own independent time period during which an acting officer "may serve," Congress would have used the word "unless" (as in, an acting officer may serve no longer than 210 days "unless" there is a nomination) and not the word "or" (which suggests an alternative time period).

When further reviewing the text of the FVRA, it is evident that the *Brian T.D.*'s interpretation of the statute misses the mark.  *Brian T.D.* relied primarily on the word "serving" to find that section 3346(a)(2) did not enable Berryhill to resume her service as Acting Commissioner after the 210-day period in 3346(a)(1) expired.  580 F. Supp. 3d at 628-29.  The court construed "serving" as the active verb in section 3346(a) and found that, because Berryhill was not "presently serving" as the Acting Commissioner when Saul was nominated, section 3346(a)(2) did not apply. *Id.* at 629.  However, the active verb in section 3346(a) is not "serving" but "may serve."  *Bauer*, 21-CV-2008-KEM, 2022 WL 2918917, at \*5.  *Brian T.D.*'s interpretation also adds the word "presently" to the statute when it is not there.  *Brent Z.*, 22-CV-511 (JWB/JFD), 2023 WL 1110449, at \*15.  Instead, as various courts have opined, the "more straightforward and common sense interpretation" of section 3346(a) is to view "serving" in its context in the clause "the person serving as an acting officer described under section 3345."  *Brooks*, 1:21CV609, 2022 WL 2834345, at \*16; *Bauer*, 21-CV-2008-KEM, 2022 WL 2918917, at \*5.  When viewed in context, this clause is "merely descriptive" and explains that the "time limits [in section 3346(a)] apply to acting officers under Section 3345 of the FVRA as opposed to acting officers under other, office-specific vacancy statutes."  *Brooks*, 1:21CV609, 2022 WL 2834345, at \*16.  Further, interpreting the statute in this manner avoids an "absurd" result.  *Miranda K. Coe*, 5:22-CV-226-KDW, 2023 WL 554119, at \*13.  The construction *Brian T.D.* seeks to employ would render section 3346(a)'s

21

time limits "nonsensical" (because the time limits would only apply to individuals who already served as acting officers) and would create a conflict with section 3345 (because it would bar the President from designating an alternative acting official after the first assistant assumed the role by default). *Brooks*, 1:21CV609, 2022 WL 2834345, at *16.

Contrary to the reasoning in *Brian T.D.*, the "structure and context" of section 3346 does not support the interpretation it advances. *Brian T.D.* found that the use of "serving" in the clause "the person serving as the acting officer may continue to serve" in section 3346(b)(2) "indicates that the use of the present participle [serving] is deliberate." 580 F. Supp. 3d at 629-30. However, the situation described in section 3346(b)(2) did not apply to Berryhill's service as Acting Commissioner — the Senate did not reject Saul's nomination. *Bauer*, 21-CV-2008-KEM, 2022 WL 2918917, at *5. Rather, *Brent Z.* offers a more reasonable interpretation of section 3346(b)(2)'s use of "serving": "[i]t makes sense that Congress, having written the subsection that allowed a person to serve during the pendency of a nomination in subdivision (a)(2), would say that such a person could "continue" their service after such a nomination failed." *Brent Z.*, 22-CV-511 (JWB/JFD), 2023 WL 1110449, at *15.

Assuming arguendo the FVRA is ambiguous, I find that legislative history and other considerations also support reading section 3346(a)(2) as a spring-back provision. In the July 1998 Senate Committee Report on the bill that later became the FVRA, Congress directly addressed the situation at issue here:

> Under new section 3346(a)(2), and subject to section 3346(b), an acting officer may serve more than [210] days if a first or second nomination is submitted to the Senate, and may serve while that nomination is pending from the date the nomination is submitted. **The acting officer may serve even if the nomination is submitted after the [210] days has passed although, as discussed below, the acting officer may not serve between the [211th] day and the day the nomination is submitted**.

S. Rᴇᴘ. No. 105-250, 1998 WL 404532, at 14 (1998) (emphasis added).[3]  Reading this language, it is evident that "Congress clearly intended for the same individual to serve as an acting official for the initial 210-day period, under § 3346(a)(1), and, if a nomination was submitted after that period, to resume acting service upon that nomination, under § 3346(a)(2)." *Hernandez*, CV 22-01556(FLW), 2022 WL 17751355, at *14.  The July 1998 Senate Committee Report also included draft language for the FVRA — specifically, for the "Vacant office" section — confirming that the language in section 3346(a)(2) should be interpreted as a spring-back provision:

> (1) if the President does not submit a first nomination to the Senate to fill a vacant office within 150 days after the date on which a vacancy occurs–
>
>> (A) the office shall remain vacant until the President submits a first nomination to the Senate

S. Rᴇᴘ. No. 105-250, 1998 WL 404532, at 27.  However, this draft language did not make it into the final version of the FVRA.  *See* 5 U.S.C. § 3348(b).  *Brian T.D.* viewed the elimination of this draft language from section 3348(b) as support for its contention that "Congress did not intend to allow such a spring back."  580 F. Supp. 3d at 633.  But, as noted by *Bauer*, the Congressional Record explains that this change was made to ensure that the Vacant office section (section 3348) applied not only when an acting officer served more than 210 days before a nomination was submitted, but also prior to 210 days if an officer or employee was not performing the functions of the vacant office in accordance with the FVRA.  21-CV-2008-KEM, 2022 WL 2918917 at *8-*9 (citing 144 Cong. Rec. 27,497 (1998)).  Thus, the draft language at issue in section 3348(b) was

---

[3] As noted by *Bauer*, the language in the proposed section 3346 changed 150 days to 210 days but otherwise stayed the same.  21-CV-2008-KEM, 2022 WL 2918917, at *8.

likely eliminated "because the plain text of Section 3346(a) rendered that language unnecessary." *Brooks*, 1:21CV609, 2022 WL 2834345, at *21.[4]

It is also worth noting that the GAO and the Department of Justice's Office of Legal Counsel have interpreted section 3346(a)(2) of the FVRA as a spring-back provision. *See* Dep't of Justice, Office of Legal Counsel, Guidance on Application of Federal Vacancies Reform Act of 1998, 1999 WL 1262050, at *6-8 (Mar. 22, 1999) (stating that the FVRA "incorporates a spring-back provision"); Gov't. Accountability Office, No. B-328888, Violation of the 210-Day Limit Imposed by the Federal Vacancies Reform Act of 1998 — Department of Energy, Director of Office of Science, www.gao.gov/assets/b-328888.pdf, at 2 (Mar. 3, 2017) (same). Finally, as stated above, the vast majority of case law (even outside of the SSA context) interpreting section 3346(a)(2) has similarly found that it is a spring-back provision. *Nw. Immigrant Rights Project v. United States Citizenship & Immigration Servs.,* 496 F. Supp. 3d 31, 57 (D.D.C. 2020) (stating that although "far more than 210 days passed before [the acting official] purported to amend the order of succession, potentially rendering that action void," that action was lawful under the FVRA because "President Trump nominated Wolf the same day that [the acting official] purported to amend the order of succession"); *Patterson v. Berryhill*, 2:18-CV-00193, 2018 WL 8367459, at *1 (W.D. Pa. June 14, 2018) (stating that "[t]he FVRA contains a 'spring-back' provision").

In summation, even though Berryhill already served as the SSA's Acting Commissioner for 210 days under section 3346(a)(1) (from January 20, 2017 to November 17, 2017), I find that section 3346(a)(2) authorized Berryhill to resume her service as Acting Commissioner on April

---

[4] Among other non-textual rationales, *Brian T.D.* also explained that it's "tolling provision" interpretation incentivizes the President to promptly nominate principal officers. 580 F. Supp. 3d at 630. However, interpreting section 3346(a)(2) as a "spring back" provision still incentivizes the President to make prompt nominations. *Bauer*, 21-CV-2008-KEM, 2022 WL 2918917, at *8.

18, 2018 once President Trump nominated Saul.[5]  As such, Berryhill was validly serving as the SSA's Acting Commissioner on July 18, 2018, when she ratified the previous appointments of ALJs, and those appointments are valid.

### 6. Appointments Clause

Plaintiff also contends that Berryhill's ratification of the appointments of ALJs on July 18, 2018 was unlawful under the Appointments Clause.  Plaintiff does nothing to flesh out this constitutional argument other than stating that he "offers the exact same arguments here as the claimants in [*Brian T.D.* and *Richard J.M.*]."  *See* [DE 16-1 at 12-13].  Plaintiff thus leaves the Court to intuit what his Appointments Clause argument is from the analyses in *Brian T.D.* and *Richard J.M.*  It is unclear whether Plaintiff is making any independent Appointments Clause argument separate and apart from his statutory FVRA argument.  Based on the brief summaries of procedural history in *Brian T.D.* and *Richard J.M.*, Plaintiff may be contending that Berryhill's service as Acting Commissioner of the SSA was too lengthy and exceeded the bounds allowed by the Appointments Clause or that (despite the FVRA) Berryhill remained an "inferior officer."  *See Brian T.D.*, 580 F. Supp. 3d at 624; *Richard J.M.*, 2022 WL 959914 at *6 & n. 7.  The Court declines to guess at what Plaintiff may be arguing.  Moreover, even if the Court infers Plaintiff's arguments, Plaintiff's citations to *Brian T.D.* and *Richard J.M.* provide no authority for his

---

[5] In his brief, Plaintiff asks the following as a rhetorical question: "who was the agency head of SSA between November 16, 2017 and April 17, 2018?"  The answer to Plaintiff's question, however, is simple: the position remained vacant as contemplated by section 3348.  Although the SSA had no formal "agency head" between November 6, 2017 and April 17, 2018, Berryhill "continued to functionally lead the SSA and perform the normal and delegable duties of the SSA Office."  *See Hernandez*, CV 22-01556(FLW), 2022 WL 17751355, at *15; Extension of Expiration Dates for Two Body System Listings, 83 Fed. Reg. 13862-01, 2018 WL 1565569 (indicating in a final rule that Berryhill was the "Deputy Commissioner for Operations, performing the duties and functions not reserved to the Commissioner of Social Security").  But the salient question is whether Berryhill was validly serving as the SSA's Acting Commissioner on July 18, 2018, when she ratified the previous appointments of ALJ.  As explained above, she was.

position, as the courts in those cases did not decide the Appointments Clause issue.  *See Brian T.D.*, 580 F. Supp. 3d at 632 ("[T]he Court's construction also avoids the question whether a post-appointment ratification satisfies the strictures of the Appointments Clause."); *Richard J.M.*, 19-CV-827 (KMM), 2022 WL 959914, at *6 n.7 ("The court offers no conclusion on whether Ms. Berryhill's ratification was consistent with the Appointments Clause.").  At any rate, were the Court to consider Plaintiff's (unspecified and unsupported) Appointments Clause arguments, the Court should reject those arguments for the same reasons articulated in *Bauer*, 21-CV-2008-KEM, 2022 WL 2918917, at *10-14.

## **CONCLUSION**

For the reasons discussed above, I respectfully **RECOMMEND** that the District Court **DENY** Plaintiff's Motion [DE 16-1] and **GRANT** Defendant's Motion [DE 17].

The parties will have fourteen days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Rodolfo A. Ruiz, II, United States District Judge.  Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1.

**DONE AND SUBMITTED** in Fort Lauderdale, Florida this 1st day of March 2023.

Jared M. Strauss
**United States Magistrate Judge**